IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00332

JOHN M. WELLS, individually and as trustee for The Wells Revocable Trust, and
VALORIE WELLS, as trustee for The Wells Revocable Trust,

    Plaintiffs,

v.

CITY OF BOULDER, and
CHRIS MESCHUK, interim city manager, City of Boulder, in his official capacity,

    Defendants.

# COMPLAINT

### NATURE OF SUIT

1. For more than seven years, the City of Boulder has maintained a categorical ban on oil and gas extraction both within its city limits and on City-owned surface property outside of city limits.

2. This ban has deprived mineral owners of their property without just compensation, which violates the United States constitution. Boulder has effected a "taking" of mineral rights within its city limits and underneath City-owned land, and owes mineral right owners compensation for this taking.

3. Plaintiffs, John and Valorie Wells, bring this suit seeking compensation for the aforementioned unconstitutional taking of property.

### OPERATIVE FACTS

**I.   The Wells Mineral Rights**

4. The property in question is the mineral rights for the Southwest Quarter

(SW1/4) of Section 4, Township 1 North, Range 70 West of the 6th PM, County of Boulder, State of Colorado. The mineral rights are severed from the surface rights, but include such use of the surface as is necessary to access, mine, drill for, etc. the minerals.

5. The surface property is owned by the City of Boulder and is designated as "open space."

6. The property is located at least partially within the City of Boulder, near Boulder Reservoir.

7. In 1981, Mr. Wells was working in partnership with a geologist named Robert Roehrs. The pair was obtaining mineral rights as part of a business/investment venture.

8. Mr. Roehrs identified the subject property as a location with oil and gas production potential and purchased the mineral rights thereon.

9. A few weeks later, in October 1981, Mr. Roehrs conveyed to Mr. Wells the 50% interest that is the subject of this suit, pursuant to a preexisting agreement between them. The deed for this transaction was recorded in Boulder County on November 19, 1981.

10. Mr. Wells held this property continuously until October 30, 2014, at which point he transferred it, via quitclaim deed, to The Wells Revocable Trust. The deed for this transaction was recorded in Boulder County on November 3, 2014. The Trust has been the property owner ever since.

11. The Wellses are co-trustees for The Wells Revocable Trust. They have all powers, authorities, and discretions granted by common law, statute, and under any rule of court, including the power to bring suit on behalf of The Trust and to sell or lease The Trust's property.

## II. Oil and Gas Production Potential

12. The property has been leased once since Mr. Wells obtained his interest in it.

13. In August 1990, Mr. Wells and Mr. Roehrs (who, at the time, still owned the other 50% of the mineral rights at the subject property), entered into a two-year oil and gas lease with WestOil Production Company.

14. Such lease was for $1600, plus a 16% royalty on any minerals extracted under the lease.

15. Ultimately, WestOil did not develop the property and no minerals were extracted.

16. Nonetheless, the subject property has significant oil and gas production potential.

17. This potential is why Mr. Wells initially purchased the property in 1981.

18. Historically, there has been oil exploration and production both on and in close proximity to the subject acreage.

19. The subject property is located at the western edge of a petroleum province known as the Denver Basin.

20. Oil and gas exploration and development has taken place in the Denver Basin for over one hundred years.

21. More recent developments in exploration and extraction technology have led to increased production and economic viability even in long-developed petroleum provinces such as the Denver Basin.

22. The Denver Basin contains the Boulder Oil Field, the second-oldest commercial oilfield west of the Mississippi.

23. The Boulder Oil Field was discovered by the drilling of the McKenzie #1 well,

which is located approximately three miles south of the subject property.

24. The Denver Basin also contains the Wattenberg Field.

25. In 2015, the Wattenberg Field was one of the top ten fields in the United States based on annual oil and gas production.

26. The subject property is just to the west of the Wattenberg Field proper, in what is sometimes referred to as the Greater Wattenberg Area.

27. The Greater Wattenberg Area has been a popular place for mineral extraction since the 1970s.

28. Oil and gas production is often discussed in terms of "formations." Described simply, a formation is a particular geologic stratum underneath the surface of the earth.

29. Two such formations in the Denver Basin are the Niobrara Formation and the Codell Formation.

30. The Niobrara begins at a typical depth of 5800 feet.

31. The Codell begins at a typical depth of 7100 feet.

32. In 1983, the Colorado Oil and Gas Commission found evidence that the "Codell Formation constitutes a common source of supply of oil and/or gas and associated hydrocarbons" underlying certain described lands, including the subject property, and issued spacing rules for production from that formation.

33. In 1992, the Colorado Oil and Gas Commission made a similar finding with regard to the Niobrara Formation and issued new spacing rules covering the subject property.

34. Plaintiffs recently obtained an appraisal of the subject property.

35. The appraiser analyzed geological and historical evidence and concluded that the subject property has significant oil and gas exploration potential.

### III. Boulder's Oil and Gas Development Ban

36. On June 4, 2013, the Boulder City Council adopted an ordinance that temporarily prohibited the City Manager and City staff from accepting or proceeding on:

    a. any application for oil and gas exploration permits on City open space properties or

    b. any application for use review under Title 9 of the Boulder Revised Code involving oil and gas extraction or exploration.

37. On the same day, the City Council adopted a separate ordinance banning the use, sale, or supply of City water for oil and gas extraction. On information and belief, this ordinance remains in effect today.

38. A few weeks later, the City Council referred a ballot issue to voters that extended the prohibitions mentioned in ¶ 36 to June 3, 2018. The voters adopted this measure in the November 2013 election.

39. Thereafter, the City Council has thrice extended the ban. The most recent such extension was enacted on December 1, 2020, and is scheduled to expire on December 31, 2021.

40. The last two extensions were enacted as part of the consent agenda, without any debate or discussion.

41. As a consequence of the actions described in ¶¶ 36 and 38–40, oil and gas development has been banned within the City of Boulder for more than seven years.

42. As a consequence of the actions described in ¶¶ 36 and 38–40, oil and gas development has been banned even on City-owned properties outside of Boulder city limits for more than seven years.

43. The ostensible purpose of these serial bans has been to impose an allegedly temporary "moratorium" on development so the City could reassess its local regulations.

However, on information and belief, no substantial progress has been made toward any Boulder-specific regulations.

44. Rather, the never-ending succession of short-term bans has been used as a pretext to cover the City's true purpose of permanently eliminating oil and gas production within city limits and on City-owned land.

45. The City has stated or implied several times that is its goal.

46. For example, in its 2021 Policy Statement on Regional, State and Federal Policy Issues, the City stated that it supported "changes to state or federal policy" that, among other things, would give the City a veto over any "oil and gas facilities on government property, such as open space lands."

47. Also, on its website the City has stated that it seeks "to protect the community's open space from oil and gas development."

48. On information and belief, both the City, in official documents or statements, and various officials speaking on behalf of the City have made additional statements regarding the City's desire to eliminate oil and gas production within city limits and on City-owned land.

49. On information and belief, the City believes that the ban furthers legitimate public purposes by improving or maintaining the health and welfare of residents of and visitors to the City and City-owned properties.

**CAUSE OF ACTION: UNCONSTITUTIONAL TAKING OF PRIVATE PROPERTY**

50. Both the federal and Colorado constitutions prohibit the taking of private property for public use without just compensation.

51. Under both federal and Colorado law, a taking can occur via regulation, without the government physically entering or taking possession of private property.

52. Such a regulatory taking occurs in at least two instances.

53. First, where regulations completely deprive an owner of "*all* economically beneficial use[]" of his property, a taking has occurred. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992).

54. Second, a regulatory taking may occur where "[t]he economic impact of the regulation on the claimant," "the extent to which the regulation has interfered with distinct investment-backed expectations," "the character of the governmental action," and other factors make the regulation tantamount to a direct appropriation of the property. *Penn Cent. Transp. Co. v. N.Y. City*, 438 U.S. 104, 124 (1978).

55. The City's actions since June 4, 2013, have destroyed the value of mineral owners' property and interfered with distinct investment-backed expectations.

56. Further, the City's ban is particularly directed at extinguishing mineral rights in the City and on City-owned property.

57. Had mineral development been allowed since June 4, 2013, Mr. Wells and the Trust could have earned approximately $19,300 in rent by leasing the subject mineral rights. Mr. Wells and the Trust also would have been entitled to a royalty for minerals actually extracted.

58. However, due to the City's actions, it has been impossible, as a practical matter, for mineral owners whose property is subject to the ban to lease, sell, or otherwise exercise their mineral rights.

59. Consequently, the City's ban has eliminated any possible economically beneficial use of the mineral rights in ¶ 4, effecting a taking of Mr. Wells' and The Trust's property for public use.

60. Furthermore, the development ban, both individually and in concert with the ban on using city water mentioned in ¶ 37, effect a taking of Mr. Wells' and The Trust's property for public use under the standard from *Penn Central*.

61.  The City's actions constitute either a temporary or permanent taking of Mr. Wells' and The Trust's property.

62.  Boulder has never compensated either Mr. Wells or The Trust for these takings.

63.  Plaintiffs would be willing to lease their mineral rights under reasonable terms, were it not for the ban.

64.  On information and belief, the other 50% owner of the property would likewise be willing to lease its mineral rights under reasonable terms, were it not for the ban.

## JURISDICTION AND VENUE

65.  Plaintiffs' claims are asserted under 42 U.S.C. § 1983 (2018) and the Fifth Amendment to the U.S. Constitution.

66.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (2018), as an action arising under the constitution and laws of the United States.

67.  Further, the Court has jurisdiction under *id.* § 1343(a) because this action seeks redress for the deprivation of constitutionally protected rights and appropriate relief for the protection of those rights.

68.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) (2018) because Defendants reside in the District and all events or omissions giving rise to Plaintiffs' claims occurred here.

## PRAYER FOR RELIEF

69.  Wherefore, Plaintiffs seek the following relief:

   a.  a declaration that the City of Boulder's actions constitute an unconstitutional taking of Mr. Wells' and The Trust's property without just compensation;

      b.    money damages from the City of Boulder sufficient to compensate Plaintiffs for the taking of their property through the date of judgment;

      c.    a permanent injunction directing Defendants to either cease enforcing the ban on oil and gas development or initiate condemnation proceedings against property subject thereto;

      d.    reasonable attorneys' fees and costs (including expert fees) under 42 U.S.C. § 1988 (2018); and

      e.    such other relief as the Court finds just and proper.

s/ Daniel E. Burrows
**Daniel E. Burrows**
Public Trust Institute
98 Wadsworth Blvd. #127-3071
Lakewood, CO 80226
Telephone: (720) 588-2008
E-mail: dburrows@publictrustinstitute.org


s/ Evan Stephenson
**Evan Stephenson**
Spencer Fane, LLP
1700 Lincoln St.
Suite 2000
Denver, CO 80203
Telephone: (303) 839-3755
E-mail: estephenson@spencerfane.com
Attorneys for Plaintiffs